CMX/2008R00271

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

2010 MAR 11 P 12: 32

CLERK'S OFFICE

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **Criminal No.** ~~JFM-10-0103~~ |
| | * | |
| **v.** | * | **(Conspiracy to Commit Export Violations** |
| | * | **and Defraud the United States, 18 U.S.C.** |
| **NAEEM MALIK** | * | **§ 371 and 50 U.S.C. § 1705(a); Unlawful** |
| **and** | * | **Export of Goods, 50 U.S.C. § 1705(a);** |
| **NADEEM AKHTAR,** | * | **Conspiracy to Unlawfully Transport** |
| | * | **Monetary Instruments and Funds,** |
| **Defendants** | * | **18 U.S.C. §§ 1956(h) and 1956(a)(2)(A);** |
| | * | **Forfeiture, 18 U.S.C. §§ 981(a)(1)(C) and** |
| | * | **982(a)(1), and 19 U.S.C. § 1595a(d))** |

*******

**INDICTMENT**

The Grand Jury for the District of Maryland charges that:

**COUNT ONE**

At all times material to this Indictment:

**The Export Administration Regulations**
**and the International Emergency Economic Powers Act**

1.     The United States Department of Commerce had the authority to prohibit or curtail

the export of goods and technologies from the United States to foreign countries, as necessary, to

protect, among other things, the national security and foreign policy of the United States.  The

Department of Commerce implemented that authority through the Export Administration

Regulations (EAR) (codified at 15 C.F.R. Parts 730-774), which restricted the export of certain

goods and technologies unless authorized by the Department of Commerce through issuance of a

valid export license by its Bureau of Industry and Security.  The EAR further prohibited any

transaction evading or avoiding, or which had the purpose of evading or avoiding, said regulations,

including the making of false or misleading statements or concealing a material fact in the course

of the submission of documents relating to an export of goods or technologies.

2.     Under the provisions of the International Emergency Economic Powers Act (IEEPA) (codified at 50 U.S.C. §§ 1701-1706), the President of the United States had the power to regulate exports and other international transactions in times of national emergency, as triggered by national security, foreign policy or economic concerns stemming from the unrestricted access by foreign parties to United States goods and technologies.  By virtue of annual executive orders issued by the President, the EAR remained in full force and effect throughout the time period of the events in this Indictment.

3.     Certain goods and technologies that had commercial applications, but also could make a significant contribution to the military or nuclear potential of other nations and could be detrimental to the foreign policy or national security of the United States, were commonly referred to as "dual-use" items.

4.     The Commerce Control List contained in the EAR (codified at 15 C.F.R. Part 774, Supplement 1) categorized dual-use items controlled for export by the Department of Commerce. Individual items on the Commerce Control List were identified by an Export Control Classification Number (ECCN) that set forth a description of the controlled commodity/technology, its licensing requirements, any potential valid license exceptions, and the reasons for its export control.  The Commerce Country Chart (codified at 15 C.F.R. Part 738, Supplement 1) further identified licensing requirements for various countries and the reasons for controlling the export of certain goods and technologies to those countries.  In combination, the ECCNs and the Commerce Country Chart defined the items subject to export controls based on the technical parameters of the item and the country of ultimate destination.

5. Items not listed on the Commerce Control List but still subject to the EAR were classified as EAR99 items. A license was required for export of such items if they were being exported to an end-user of concern or in support of a prohibited end-use. For example, Section 744.2 of the EAR required a license from the Department of Commerce to export, reexport or transfer items subject to the EAR if, at the time of export, it was known that the item would be used directly or indirectly in activities related to nuclear explosives, nuclear reactors, and the processing and production of nuclear-related materials. Such items would include, but not be limited to, radiation detection devices, resins for coolant water purification, calibration and switching equipment, and surface refinishing abrasives.

6. The Entity List contained in the EAR (codified at 15 C.F.R. Part 744, Supplement 4) identified organizations of concern to the government believed to be acting contrary to the national security or foreign policy interests of the United States. The Entity List required that a license be obtained from the Department of Commerce to export any item subject to the EAR to various entities, including: (a) Pakistan's Space and Upper Atmosphere Research Commission (SUPARCO); and (b) the Pakistan Atomic Energy Commission (PAEC) and its subordinate entities -- the Pakistan Institute for Nuclear Science and Technology (PINSTECH), the National Development Complex, and all fuel reprocessing and enrichment facilities, uranium processing facilities, conversion and enrichment facilities, heavy water production facilities and co-located ammonia plants, and nuclear reactors and power plants. Among the nuclear power plants and reactors in operation in Pakistan during the time-frame of this Indictment were the Chasma Nuclear Power Plant I (CNPP) in Kundian, Pakistan, and the research reactor maintained by the Pakistan Institute of Engineering and Applied Sciences (PIEAS), a constituent institution of the PAEC in Nilore, Pakistan, specializing

in nuclear-related research and development.

7.      Pursuant to United States law and regulation, exporters, shippers and/or freight forwarders were required to file certain forms and declarations concerning exports of goods and technologies from the United States depending upon the circumstances of the individual export. These forms and declarations could include, but not be limited to, air waybills, bills of lading, packing lists, sales invoices, certificates of origin, and Shipper's Export Declarations (SED). The filing of a SED would be required if, among other things, the value of the item to be exported exceeded $2,500, and/or if the item was being exported pursuant to an export license. A SED would identify the nature and value of the item being exported, its true and final destination, and the identity of the individual or entity seeking to export the item. The filing of a SED would alert the Department of Commerce to the export and enable it and other agencies to track the export and ascertain compliance with licensing and other export requirements and restrictions.

## Defendants and Other Entities

8.      Defendant **NAEEM MALIK**, a Pakistani national residing in Pakistan, was the owner and Chief Executive of NewTech Global (NewTech), a trading company located in Karachi, Pakistan. NewTech had business relationships with various governmental entities in Pakistan and obtained commodities for those entities from the United States and other countries. **MALIK** had employees and associates at various locations assisting him with NewTech business, including, but not limited to: Karachi and Rawalpindi, Pakistan; Dubai, United Arab Emirates (Dubai); Cerritos, California; and locations in Maryland associated with Defendant **NADEEM AKHTAR**.

9.      Defendant **NADEEM AKHTAR**, a Pakistani national and lawful permanent resident of the United States, was the owner of Computer Communication USA (CC-USA, a/k/a CCI-USA),

4

a company that he incorporated in Maryland. **AKHTAR** represented CC-USA to be a subsidiary of a Pakistani company called Computer Communication International (CCI). **AKHTAR** engaged in activities relating to CC-USA and NewTech primarily at his various residences in Columbia, Laurel, and Silver Spring, Maryland.

10. A company located in North Dakota, identified herein as Company A1, sold personal radiation detectors and radiation monitors, including a Model DMC-2000S Personal Electronic Dosimeter manufactured by another company located in Smyrna, Georgia, identified herein as Company A2. The DMC-2000S dosimeter was a dual-use item used to identify and detect radiation, It was classified under ECCN 1A999, which limited the export to Pakistan of certain radiation detection, monitoring and measurement equipment based on the entity and end-use restrictions contained in the EAR.

11. A company located in Pennsylvania, identified herein as Company B, manufactured specialty resins for use in the nuclear, power, chemical and petrochemical, and defense industries. The company's nuclear grade resins, such as the NRW100 and NRW400 resins, which were designed for the purification of coolant water in the primary and secondary circuits of nuclear power plants, were classified as dual-use EAR99 commodities.

12. A company located in Maryland, identified herein as Company C, designed, manufactured and marketed high-reliability integrated circuits and packaging, motion control, microwave and radio frequency devices, and components and subsystems for the aerospace, defense, fixed broadband, wireless/mobile, and test and measurement markets. The company's product line included the Model 90 Fixed Coaxial Attenuator, which was used for operating, calibrating, troubleshooting, or repairing a radio frequency system, was classified as a dual-use EAR99

commodity.

13.     A company located in Massachusetts, identified herein as Company D, sold a variety of products designed for switching and controlling electrical circuits and lighting.  The company's Series 20M Selector Switches, which were "safety qualified" by the Nuclear Regulatory Commission for use in nuclear power and fuel reprocessing plants, were classified as dual-use EAR99 commodities.

14.     A company located in Tennessee, identified herein as Company E, manufactured alpha/beta counting systems for health physics, radiation safety, radiochemistry,  and nuclear fuel cycle applications.  Its MPC 9300 Manual Alpha/Beta Counting System, which was designed to detect the presence of alpha or beta radiation, was a dual-use item classified under ECCN 1A999.

15.     A company located in Texas, identified herein as Company F, sold a variety of industrial and packaging machinery and supplies, including abrasives and adhesives, some of which were manufactured by 3M.  Certain of these 3M abrasive sheets, which were of a quality suitable for refinishing the surfaces of valves and other equipment requiring high tolerances for proper operation, were classified as dual-use EAR99 commodities.

16.     A company located in Texas, identified herein as Company G, designed, manufactured, and supplied a variety of radiation detection and measurement equipment.  Its Model 2350-1 Data Logger was classified as an EAR99 item.  Its Model 44-10 Gamma Scintillation Detector, Model 44-94 Diamond Cluster Pancake Detector, and Model 44-38 Energy Compensated Detector were classified under ECCN 1A999 and compatible for use in conjunction with the Model 2350-1 Data Logger for measurement of alpha, beta, and gamma ionizing radiation.

## The Charge

17.     Beginning in or about October 2005, and continuing through on or about the date of the return of this Indictment, in the State and District of Maryland and elsewhere,

**NAEEM MALIK**
**and**
**NADEEM AKHTAR,**

defendants herein, did knowingly and intentionally combine, conspire, confederate and agree with each other, and with others known and unknown to the Grand Jury, to:

a.      commit an offense against the United States, that is, to knowingly and willfully export and cause to be exported certain goods and technologies from the United States to Pakistan without having first obtained the required licenses or authorizations from the Department of Commerce, in violation of Title 50, United States Code, Section 1705, and Title 15, Code of Federal Regulations, Section 764.2; and

b.      defraud the United States by impairing, impeding and obstructing the lawful governmental functions of the Department of Commerce.

## Objects of the Conspiracy

18.     The objects of the conspiracy were:

a.      to supply restricted entities in Pakistan with commodities from the United States by evading the prohibitions and licensing requirements of the EAR;

b.      to interfere and obstruct the lawful governmental functions of the Department of Commerce by concealing the true nature of certain exports through deceit and dishonest means.

## Manner and Means of the Conspiracy

19.     The manner and means by which the defendants and their coconspirators sought to

accomplish the objects of the conspiracy included, among others, the following:

a.    The defendants and their coconspirators used personal and business e-mail accounts to communicate with one another and others located in the United States, Dubai, and Pakistan in connection with obtaining specific commodities for export to Pakistan.

b.    The defendants and their coconspirators placed, or cause to be placed, materially false, misleading, and incomplete information in various documents, such as invoices, purchase orders, air waybills, and end-user statements, in order to conceal the ultimate end-use and/or end-users of the commodities sought to be purchased and exported, and their true value.

c.    **MALIK** would obtain orders for commodities from restricted entities in Pakistan and then direct **AKHTAR** as to what commodities to purchase in the United States for export to Pakistan, and the methods to be used to conceal the true nature, value, and end-use/end-user of the items.

d.    **AKHTAR** would negotiate prices with manufacturers and suppliers of the commodities sought in the United States, would place the orders for said commodities, and would arrange for shipment of said commodities usually through a freight forwarder in the United States. As a means by which to evade export restrictions and licensing requirements, including the filing of a SED, **AKHTAR** would falsely identify to the freight forwarder relevant details regarding a particular item sought to be shipped by providing a CCI/CC-USA invoice that contained false information regarding the nature of the item purchased for export and its true value, and that failed to reveal the ultimate consignee or true end-user.

e.    As a means by which to conceal the true end-users of the commodities they sought for export, the defendants and their coconspirators utilized third parties and various business

entities in Pakistan, Dubai, and the United States to obtain said commodities from their United States manufacturers and suppliers, and/or to pose as the ultimate consignee/purchaser of said commodities. **AKHTAR** also used various addresses in California, including his prior residential address in Downey, California, as false addresses for NewTech in the United States.

f.      The defendants and their coconspirators arranged for the commodities they purchased in the United States for restricted entities in Pakistan to be shipped initially to Dubai as a means by which to conceal the true end-users of the exported items.

g.      **MALIK** generally charged the ultimate end-users of the exported items more than the actual cost paid for each item, as well as all associated shipping costs, in order to garner a profit for himself and his company.  As part of his business arrangement with **MALIK, AKHTAR** normally received a commission of approximately five to seven and a half  percent of the cost of each item he obtained for export.

h.      The defendants and their coconspirators wire-transferred funds from Pakistan and Dubai to individuals and bank accounts in the United States, including **AKHTAR**'s personal and CC-USA bank accounts in Maryland, to pay for the costs associated with obtaining and exporting commodities from the United States. **AKHTAR** used the monies in his Maryland bank accounts to pay the manufacturers/suppliers of the commodities being purchased, third parties procuring commodities on the defendants' behalf and at their direction, and any other expenses associated with obtaining and exporting the commodities. The defendants and their coconspirators also used their personal and business credit cards, as well as credit cards belonging to third parties, to make payments relating to the purchase of the commodities sought for export.

## Overt Acts Committed in Furtherance of the Conspiracy

20.     In furtherance of the conspiracy and to effect its objects, at least one of the conspirators committed and caused to be committed overt acts in the District of Maryland and elsewhere, including, but not limited to, the following:

### A.  Export of Dosimeters

(A1)    On or about October 6, 2005, **MALIK** sent an e-mail to **AKHTAR** requesting that he obtain 300 Model DMC-2000S dosimeters from Company A1 starting with an initial order of 100. **MALIK** told **AKHTAR** not to tell Company A1 that the items were destined for Pakistan.

(A2)    On or about October 11, 2005, **AKHTAR** sent an e-mail to a Company A1 representative placing an order for 100 dosimeters.

(A3)    On or about October 17, 2005, after having received an e-mail from a Company A1 representative requesting end-user information for the dosimeter order and advising that the manufacturer, Company A2, would have to handle the order directly if the products were going overseas or to a nuclear power plant, **AKHTAR** sent an e-mail to **MALIK** indicating that he was having difficulty obtaining the dosimeters in the United States and that it might help to change the "brand" of the items being requested given the "strict rules" of the manufacturer.

(A4)    On or about February 17, 2006, **MALIK** sent an e-mail to **AKHTAR** stating that they had been asked to supply dosimeters in "batches," and suggesting that **AKHTAR** buy 40 to 50 units from different companies under the names of different buyers in order to complete the sales.

(A5)    On or about May 17, 2006, **AKHTAR** caused a wire transfer of $5,000.00 from his Maryland CC-USA bank account to the bank account of a wireless company in Illinois as

payment towards a future purchase of dosimeters.

(A6)   On or about May 22, 2006, **MALIK** sent an e-mail to a Pakistani business associate with a draft of a letter to be forwarded to the CNPP thanking it for its dosimeter order, stating that the dosimeters would be supplied by the manufacturer in batches of 100 units, and requesting approval for partial delivery and partial payment terms.

(A7)   On or about May 23, 2006, **MALIK** drafted a joint financing proposal for the CNPP dosimeter order reflecting the purchase of 300 units at a cost of $330.75 per unit.

(A8)   On or about June 5, 2006, **AKHTAR** caused a wire transfer of $10,000.00 from his Maryland CC-USA bank account to the bank account of a wireless company in Illinois as payment towards a future purchase of dosimeters.

(A9)   On or about July 4, 2006, **MALIK** sent an e-mail to **AKHTAR** telling him to invoice the dosimeters at a price of $2.50 each and ship them via FedEx to a business associate in Dubai.

(A10)   On or about July 18, 2006, **AKHTAR** caused a wire transfer of $30,350.00 from his Maryland CC-USA bank account to the bank account of a wireless company in Illinois as payment towards a future purchase of dosimeters.

(A11)   On or about July 19, 2006, **AKHTAR** caused the owner of a wireless company in Illinois to purchase 100 Model DMC-2000S dosimeters on his behalf from Company A1 at a cost of $282.00 per unit.

(A12)   On or about July 24, 2006, **AKHTAR** sent an e-mail to **MALIK** stating that he would be shipping 100 dosimeters to Dubai on "Friday" and that he had already placed an order for 200 additional units.

(A13)  On or about July 31, 2006, **AKHTAR** sent an e-mail to a freight forwarder in Virginia to which he attached a false CCI invoice alleging the sale by NewTech Global in Downey, California, of 100 "digital calculators," valued at $3.50 per unit, to Shairook Scrap USP (LLC) in Dubai.  **AKHTAR** requested that the items be shipped that day.

(A14)  On or about July 31, 2006, **AKHTAR** caused the export of 100 Model DMC-2000S dosimeters from the United States to the CNPP without having obtained the requisite authorization from the Department of Commerce.

(A15)  On or about August 4, 2006, **MALIK** sent an e-mail to a Pakistani business associate, under the subject line "Re:RFQ:CNPP LTD/OPEN TENDER ITEMS," stating that the "DOSIMETERS ARE IN MY HAND - QTY - 100."

(A16)  On or about September 7, 2006, **AKHTAR** caused a wire transfer of $25,000.00 from his Maryland CC-USA bank account to the bank account of a wireless company in Illinois as payment towards a future purchase of dosimeters.

(A17)  On or about September 13, 2006, **MALIK** sent an e-mail to **AKHTAR** directing him to buy 200 additional dosimeters and FedEx them "quickly."

(A18)  On or about September 25, 2006, **AKHTAR** caused a wire transfer of $25,000.00 from his Maryland CC-USA bank account to the bank account of a wireless company in Illinois as payment towards a future purchase of dosimeters.

(A19)  On or about October 2, 2006, **AKHTAR** caused the owner of a wireless company in Illinois to place an order on his behalf with Company A1 to purchase 200 dosimeters.

(A20)  On or about October 3, 2006, **AKHTAR** caused the owner of a wireless company in Illinois to purchase 52 dosimeters on his behalf from Company A1 at a cost of $315.00

per unit.

(A21)  On or about October 13, 2006, **AKHTAR** caused the owner of a wireless company in Illinois to purchase 74 dosimeters on his behalf from Company A1 at a cost of $315.00 per unit.

(A22)  On or about November 7, 2006, **MALIK** sent an e-mail to **AKHTAR** telling him to ship the dosimeters to a business associate in Dubai.

(A23)  On or about November 10, 2006, **AKHTAR** caused the owner of a wireless company in Illinois to purchase 74 dosimeters on his behalf from Company A2 at a cost of $307.00 per unit.

(A24)  On or about November 15, 2006, **AKHTAR** sent an e-mail to a freight forwarder in Virginia to which he attached a false CCI invoice alleging the sale by NewTech Global in Downey, California, of 200 "digital pagers," valued at $2.50 per unit, to a third party in Dubai. **AKHTAR** requested that the items be shipped that day.

(A25)  On or about November 15, 2006, **AKHTAR** caused the export of 200 Model DMC-2000S dosimeters from the United States to the CNPP without having obtained the requisite authorization from the Department of Commerce.

B.  Export of Nuclear-Grade Resins

(B1)  On or about December 2, 2005, **MALIK** sent an e-mail to **AKHTAR** advising that they had a tender for resins manufactured by Company B.  **MALIK** told **AKHTAR** to get information on prices and availability.

(B2)  On or about February 13, 2006, **AKHTAR** forwarded to **MALIK** an e-mail from a Company B representative inquiring about the final destination for the resins **AKHTAR** was

seeking to obtain.  The representative advised **AKHTAR** that if the resins were going to Pakistan, the company would need to get permission from the United States government to sell the resins to him.

(B3)  On or about March 3, 2006, **MALIK** sent an e-mail to a Pakistani business associate advising that the CNPP had issued a new tender notice to them for a number of items, including nuclear grade resins.

(B4)  On or about March 3, 2006, **MALIK** sent an e-mail to **AKHTAR** directing him to make another attempt to obtain prices for the resins, but to change the quantities and add "a few other non-nuclear resins" in the quote request.

(B5)  On or about March 3, 2006, **AKHTAR** caused the owner of a wireless company in Illinois to contact a Company B representative by telephone and request a quote for nuclear grade resins that he alleged were for a location in Maryland.

(B6)  On or about March 24, 2006, **MALIK** sent an e-mail to **AKHTAR** telling him that failure to complete the resins order would result in "stoppage of the plant" for which they would be held responsible.  **MALIK** directed **AKHTAR** to place the order by ordering portions of the resins every few days in the names of "alternate companies."

(B7)  On or about April 23, 2006, **MALIK** sent an e-mail to a business associate in Dubai asking him to obtain a trading company "contact" they could use to import "chemicals" for re-export to Pakistan, since he had ordered two types of "chemicals" from the United States that he had been told could be exported to Dubai, but not to Pakistan.

(B8)  On or about May 1, 2006, **MALIK**'s Dubai business associate, acting at **MALIK**'s direction and on his behalf, sent an e-mail to **AKHTAR** representing that he needed to

14

buy Company B resins, and requesting a price quote on the items for sale and shipment to Bosfor General Trading in Dubai.

(B9)   On or about May 8, 2006, **AKHTAR** placed an order with a Company B contractor on behalf of NewTech Global in Cerritos, California, for 25 cubic feet of NRW100 resin at a total cost of $1,112.50.

(B10)   On or about May 11, 2006, **AKHTAR** caused the credit card of an associate in Cerritos, California, to be charged $1,112.50 by Company B for payment of the resin order placed on or about May 8, 2006.

(B11)   On or about May 17, 2006, **AKHTAR** sent an e-mail to a freight forwarder in Virginia to which he attached a false CCI invoice alleging the sale by NewTech Global in Downey, California, of 5 drums containing a total of 25 cubic feet of "resin for water purification," valued at a total cost of $250.00, to Bosfor General Trading in Dubai.

(B12)   On or about May 17, 2006, **AKHTAR** caused the export of 5 drums containing a total of 25 cubic feet of NRW100 resin from the United States to the CNPP without having obtained the requisite authorization from the Department of Commerce.

(B13)   On or about May 21, 2006, **MALIK** sent an e-mail to his business associate in Dubai advising him of the details of the upcoming air shipment of resin from the United States to "Bosfor Trading," and directing that he arrange for the immediate shipment of the resin to Pakistan by the "fastest means" and that he remove all original invoices included in the original shipment from the United States.

(B14)   On or about May 26, 2006, **AKHTAR** placed an order with a Company B contractor on behalf of NewTech Global in Cerritos, California, to purchase 50 cubic feet of

NRW100 resin and 50 cubic feet of NRW400 resin at a total cost of $9,475.00.

(B15)  On or about June 7, 2006, **AKHTAR** caused a credit card payment to be made to Company B from his Maryland CC-USA account, in the amount of $9,475.00, towards the purchase of the resins ordered on or about May 26, 2006.

(B16)  On or about June 12, 2006, **MALIK** sent an e-mail to **AKHTAR** telling him to ship the resins order to Shairook Scarps USP (LLC) in Dubai.

(B17)  On or about June 13, 2006, **AKHTAR** sent an e-mail to **MALIK** to which he attached a copy of the false CCI invoice accompanying the recent resin order.  The false invoice alleged the sale by NewTech Global in Downey, California, of 10 drums containing a total of 50 cubic feet of "resin for water purification w-100," and 10 drums containing a total of 50 cubic feet of "resin for water purification w-400," valued at a total cost of $600.00, to Shairook Scrap USP (LLC) in Dubai.

(B18)  On or about June 19, 2006,  **AKHTAR** caused the export of 10 drums containing a total of 50 cubic feet of NRW100 resin and 10 drums containing a total of 50 cubic feet of NRW400 resin from the United States to the CNPP without having obtained the requisite authorization from the Department of Commerce.

(B19)  On or about June 21, 2006, **MALIK** sent an e-mail to his Dubai business associate to which he attached the bill of lading for the recent resin shipment sent by **AKHTAR** from the United States to Shairook Scrap USP (LLC).  **MALIK** directed his associate to re-ship the items to him once received in Dubai.

(B20)  On or about March 13, 2007, **MALIK**, responding to a request from his Pakistani business associate for a status on pending CNPP supply orders, sent an e-mail to that

16

associate with an updated list of the pending orders.  Included in that list was a notation referencing a CNPP supply order for nuclear grade resins and indicating that no further items could be provided until the resolution of payment for resins already delivered.

(B21)  On or about November 16, 2007, **MALIK** sent an e-mail to his Pakistani business associate to which he attached his corrected copy of a letter to be sent by the associate to the CNPP concerning the plant's order for supplies of nuclear grade resins.  In that letter, the associate apologized for not being able to fully complete the requested supply order, noting that "[d]ifficulties were faced as these stores were for Nuclear Application."  Also in that letter, the associate confirmed the dates and amounts of completed and pending deliveries of nuclear grade resins to the CNPP.

### C.  Export of Coaxial Attenuators

(C1)   On or about October 27, 2006, **MALIK** sent an e-mail to **AKHTAR** requesting a price quote for 8 Model 90 fixed coaxial attenuators from Company C.

(C2)   On or about March 21, 2007, **AKHTAR** sent an e-mail to **MALIK** advising that the attenuator order was delayed because the manufacturer was requiring an end-user statement.

(C3)   On or about June 20, 2007, **MALIK** sent an e-mail to **AKHTAR** with two end-user certificates attached, both of which alleged that the attenuators would be utilized in a research project "related to RF applications."  One of the certificates, alleging that SUPARCO would be the end-user, listed the name of an individual representing himself to be SUPARCO's "Chief Executive," but whose name was identical to that of one of **MALIK**'s NewTech employees in Karachi.  The other end-user certificate alleged that NewTech Global would be the end-user. **MALIK** told **AKHTAR** to use whichever certificate he thought appropriate.

(C4)   On or about June 21, 2007, **AKHTAR** sent an e-mail to a Company C representative to which he attached the false SUPARCO end-user certificate previously provided by **MALIK**.

(C5)   On or about July 5, 2007, **AKHTAR** sent an e-mail to a Company C representative with a CCI order attached for purchase of 8 Model 90 fixed coaxial attenuators.

(C6)   On or about August 20, 2007, **MALIK** caused one of his employees to e-mail him a document entitled "LIST OF SUPARCO PENDING ORDER" that contained various items with corresponding SUPARCO order numbers and their delivery status.  Included in the list were nine (9) attenuators scheduled for "shipment next week" with corresponding model numbers that matched those ordered by **AKHTAR** from Company C.

(C7)   On or about September 11, 2007, **AKHTAR** caused a credit card payment to be made to Company C from his Maryland CC-USA account, in the amount of $3031.59, towards the purchase of 8 Model 90 fixed coaxial attenuators to be shipped to "Computer Communication Int'l" at **AKHTAR**'s residential address in Silver Spring, Maryland.

(C8)   On or about September 29, 2007, **MALIK** sent an e-mail to **AKHTAR** telling him to ship the attenuators via Air Karachi.

(C9)   On or about October 11, 2007, **AKHTAR** sent an e-mail to a freight forwarder in Virginia to which he attached a CCI invoice for items ready for shipment.  The false invoice alleged the sale of numerous commodities by NewTech Global at **AKHTAR**'s residential address in Silver Spring, Maryland, to "Naeem" at NewTech Global in Pakistan, including 9 "Computer Part (Attenuators))" valued at $10.00 each.

(C10)   On or about October 15, 2007, **AKHTAR** caused the export of various Model

18

90 fixed coaxial attenuators from the United States to SUPARCO without having obtained the requisite authorization from the Department of Commerce.

D.   Export of Selector Switches

(D1)   On or about November 4, 2006, after receiving a request from a CNPP representative for a price quote for various Series 20M selector switches from Company D, **MALIK** sent an e-mail to **AKHTAR** asking him to obtain information on prices and availability for the requested items.

(D2)   On or about November 6, 2006, **AKHTAR** sent an e-mail to Company D requesting a price quote for the list of items previously provided to him by **MALIK**.

(D3)   On or about November 27, 2006, **MALIK** sent an e-mail to a CNPP representative with an attached NewTech invoice for CNPP order number JP-2K6-114. The invoice reflected a revised price quote for the requested selector switches totaling $82,666.00 and stated that the items would be shipped via air freight from Dubai to Karachi.

(D4)   On or about January 16, 2007, **AKHTAR** sent an e-mail to **MALIK** warning that a request for a long list of parts, such as the quote for switches, would raise suspicions that the items were destined for an overseas user. **AKHTAR** suggested that "next time we break these quote into different segmwnt (sic)."

(D5)   On or about July 9, 2007, **AKHTAR** sent an e-mail to a Company D representative to which he attached a CCI purchase order confirming the purchase of selector switches from Company D at a total price of $63,250.00. The purchase order reflected **AKHTAR**'s name and residential address in Silver Spring, Maryland.

(D6)   On or about July 10, 2007, **AKHTAR** caused a wire transfer of $9,487.50

from his Maryland CC-USA bank account to Company D as partial payment for the selector switches.

    (D7)   On or about July 18, 2007, **MALIK** sent an e-mail to a CNPP representative advising that the delivery date of the requested selector switches had been extended by the manufacturer.  **MALIK** further indicated that "[s]ince these switches are restricted items and have nuclear application, it is recommended that we must accept this extension as insisting on delivery date which is [earlier] may create problems."

    (D8)   On or about September 21, 2007, **AKHTAR** caused payment of a check from his Maryland CC-USA bank account in the amount of $23,775.00 to be made to Company D as partial payment for the selector switches.

    (D9)   On or about September 26, 2007, **AKHTAR** caused $15,000.00 to be paid to Company D as partial payment for the selector switches.

    (D10)  On or about September 28, 2007, **AKHTAR** caused $15,000.00 to be paid to Company D as partial payment for the selector switches.

    (D11)  On or about October 1, 2007, **AKHTAR** sent an e-mail to a Company D representative advising that he would arrange to have his shipper pick up the selector switches (packaged in 3 boxes) from the company.

    (D12)  On or about October 2, 2007, **MALIK** sent an e-mail to **AKHTAR** directing him to ship the selector switches and other items by FedEx to a business associate in Dubai and invoice the shipped items at a false total price of $200.00.  **MALIK** also directed **AKHTAR** to use the same false valuation on the air waybill accompanying the shipment.

    (D13)  On or about October 11, 2007, **AKHTAR** sent an e-mail to **MALIK**

requesting that he review an attached false CCI invoice alleging the sale by NewTech Global in Downey, California, of 3 boxes of "Engine spare parts(switches)," valued at a total cost of $450.00, to **MALIK**'s business associate in Dubai.

(D14)   On or about October 21, 2007, **MALIK** sent an e-mail to **AKHTAR** revising the previously sent false CCI invoice to omit the word "engine" and allege purchase of three (3) boxes of "spare parts(switches)."

(D15)   On or about October 22, 2007, **AKHTAR** sent an e-mail to a freight forwarder in Virginia to which he attached the revised false CCI invoice previously received from **MALIK**.

(D16)   On or about October 24, 2007, **AKHTAR** caused the export of numerous Series 20M selector switches from the United States to the CNPP without having obtained the requisite authorization from the Department of Commerce.

(D17)   On or about February 21, 2008, **MALIK** sent an e-mail to a representative of the CNPP, under the subject line "Re: Detail of orders supplied updated," confirming completion and accounting of various CNPP orders, including order number JP-2K6-114 which encompassed the previously shipped selector switches.

E.   Export of Alpha/Beta Counting System

(E1)   On or about March 3, 2007, after having received a request from a CNPP representative to quote prices for the purchase of a MPC 9300 manual alpha-beta counting system, **MALIK** sent **AKHTAR** an e-mail telling him to obtain a quotation from Company E.

(E2)   On or about March 7, 2007, **AKHTAR** sent **MALIK** an e-mail providing prices for the requested alpha-beta system.

(E3)   On or about March 19, 2007, **MALIK** sent an e-mail to **AKHTAR** indicating

21

that the alpha-beta system had been approved for purchase by the customer.  **MALIK** further indicated that the customer wanted confirmation from NewTech that it would deliver the items and "accept all penalties in case of default."  He asked **AKHTAR** to give him his views on the matter, and suggested that **AKHTAR** place the order with a five percent advance to confirm the order, and as "probing tactics" to gauge the manufacturer's "reaction."

(E4)    On or about March 21, 2007, **MALIK** sent an e-mail to a CNPP representative, which he subsequently forwarded to **AKHTAR**, falsely representing that an end-user certificate would not be required from the CNPP to complete the purchase and export of the alpha-beta system from the United States.

(E5)    On or about May 31, 2007, **MALIK** sent an e-mail to a CNPP representative advising that the alpha-beta machines were considered "nuclear accessories" and that his company had obtained their quote through a third party "so as to avoid disclosing the user in the best interest of [the] State."  **MALIK** cautioned the CNPP against seeking other quotations on the items through public advertisement in the press, stating that doing so would "seriously jeopardize the whole case and we fear that CNPP will not be able to obtain the item from any source as the requirement will be exposed and will ... adversely affect your procurement plans."

(E6)    On or about July 9, 2007, **MALIK** sent an e-mail to a CNPP representative to which he attached a revised quote for the alpha-beta system in the amount of $73,565.00.

(E7)    On or about July 20, 2007, **AKHTAR** sent an e-mail to a Company E representative providing credit card billing information to cover the initial $5,000.00 downpayment for the purchase of 2 alpha-beta counting machines and accessories.  The credit card was in the name of a third party at a billing address in the United Kingdom.

(E8)    On or about September 24, 2007, **MALIK** sent an e-mail to **AKHTAR** asking what he planned to do in response to an inquiry from Company E regarding the identity of the end-user of the alpha-beta machines.  **MALIK** told **AKHTAR** that he could use "Shairook USP LLC" if needed in connection with the transaction.

(E9)    On or about September 26, 2007, in response to previous inquiries from Company E, **AKHTAR** sent an e-mail to a Company E representative falsely stating that the buyer and owner of the alpha-beta counting system being purchased was NewTech Global in Cerritos, California, which would be leasing the equipment for one year to SUPARCO in Pakistan.  This e-mail prompted Company E to advise **AKHTAR** that an export license would be required and that they needed details regarding the end-user's point of contact.

(E10)   On or about November 3, 2007, **MALIK** sent an e-mail to **AKHTAR** to which he attached a false end-user certificate for the alpha beta transaction.  The certificate alleged that "NewTech Laboratories & Medical Centre" (located at the same address as NewTech in Pakistan), having procured 2 MPC-9300 alpha-beta counting systems from Company E through their agent, CCI-USA, would be using the systems for radiochemistry applications in their laboratories. **MALIK** told **AKHTAR** to use this end-user certificate in connection with the alpha beta transactions because it was "more clear."

(E11)   On or about January 18, 2008, **AKHTAR** caused a wire transfer of $28,750.00 from his Maryland CC-USA bank account to Company E to complete payment for the alpha-beta counting machines.

(E12)   On or about January 21, 2008, **AKHTAR** caused Company E to issue a final invoice documenting the purchase by CC-USA in Silver Spring, Maryland, of 2 alpha-beta counting

systems at a total price of $33,750.00.  The invoice noted the end-user and end-use of the items as set forth in a false end-user certificate provided by **AKHTAR**.  The certificate was signed by an individual falsely representing himself to be the head of Procurement for PIEAS.  The name on the certificate was identical to that of a CNPP representative who had an ongoing relationship with **MALIK** and NewTech procuring commodities for the CNPP.  The certificate alleged that the alpha-beta machines would be used in the PIEAS labs in "radiochemistry applications" and were being procured "through their agent" in the United States, CCI-USA in Columbia, Maryland.

(E13)  On or about January 25, 2008, **AKHTAR** generated a false CCI invoice alleging the sale by CC-USA of 2 "alpha-beta counting machine system[s]," valued at a total cost of $1000.00, to Shairook USP LLC in Dubai.

(E14)  On or about January 30, 2008, **AKHTAR** caused the export of 2 MPC 9300 manual alpha/beta counting systems from the United States to the CNPP without having obtained the requisite authorization from the Department of Commerce.

(E15)  On or about February 7, 2008, **MALIK** sent an e-mail to a CNPP representative advising that the requested alpha-beta counting systems were ready for shipment from Dubai.

(E16)  On or about May 29, 2008, upon being advised by a CNPP representative that the entity had received the 2 alpha-beta systems but was having difficulty operating them, **MALIK** sent an e-mail to **AKHTAR** telling him to ask Company E if certain modifications could be made to the units.  **MALIK** also told **AKHTAR** to obtain a quote for the related software that their customer wanted to buy.

F.  Export of 3M Abrasive Sheets

(F1)    On or about September 17, 2007, **MALIK** sent an e-mail to **AKHTAR** asking him to provide prices for various 3M abrasive sheets sold by Company F.  The itemized list provided by **MALIK** in the e-mail had been received by him in an earlier e-mail from a CNPP representative requesting a price quote for the items.

(F2)    On or about September 18, 2007, **AKHTAR** sent an e-mail to **MALIK** with prices for the 3M abrasive sheets as quoted to him by Company F.

(F3)    On or about September 19, 2007, **MALIK** sent an e-mail to the CNPP to which he attached a quote on NewTech letterhead for the 3M abrasive sheets.  The total price quoted was approximately $15,978.00.

(F4)    On or about October 18, 2007, **MALIK** sent an e-mail to the CNPP to which he attached a quote for the 3M abrasive sheets identical in substance to the prior quote, but on the letterhead of NewTech's "principal," "Shairook USP LLC."

(F5)    On or about November 19, 2007, **MALIK** sent an e-mail to **AKHTAR** advising him that the order for 3M abrasive sheets had been issued.  **MALIK** told **AKHTAR** to place the order for shipment by sea.

(F6)    On or about January 28, 2008, **AKHTAR** caused a wire transfer of $3,050.00 from his Maryland CC-USA bank account to Company F as partial payment for the 3M abrasive sheets.

(F7)    On or about February 15, 2008, **AKHTAR** caused a wire transfer of $4,051.48 from his Maryland CC-USA bank account to Company F as partial payment for the 3M abrasive sheets.

(F8)   On or about February 18, 2008, **AKHTAR** caused Company F to ship to a freight forwarder in Virginia 3 boxes of 3M abrasive sheets, invoiced at a total price of $7,144.23, that were purchased by **AKHTAR** in the name of CC-USA, Silver Spring, Maryland.

(F9)   On or about March 12, 2008, **AKHTAR** sent an e-mail to **MALIK** to which he attached a copy of a false CCI invoice alleging the sale by CC-USA of 3 boxes of "3M Abbrassive," valued at a total cost of $150.00, to Shairook Scrap USP (LLC) in Dubai.

(F10)   On or about April 8, 2008, **AKHTAR** forwarded to **MALIK** a copy of an e-mail inquiry sent to **AKHTAR** by a Special Agent with the Department of Commerce. In response, **MALIK** sent an e-mail to **AKHTAR** providing a false answer to the agent's question as to the identity of the end-user of the 3M abrasive sheets.

(F11)   On or about April 8, 2008, **AKHTAR** sent an e-mail to the Department of Commerce Special Agent falsely indicating, as directed by **MALIK**, that the end-user of the 3M abrasive sheets awaiting shipment at a freight forwarder in Virginia would be the "Karachi Shipyard & Engineering Works Machine Shop."

(F12)   On or about May 1, 2008, **AKHTAR** caused the export of 3 boxes of 3M abrasive sheets from the United States to the CNPP without having obtained the requisite authorization from the Department of Commerce.

G.   Export of Radiation Loggers and Detectors

(G1)   On or about February 11, 2008, **MALIK** sent an e-mail to **AKHTAR** directing him to place an order for two of each of the following items as priced on the Company G website: Model 2350-1 Data Logger (and carrying case), Model 44-10 Gamma Scintillation Detector, Model 44-94 Diamond Cluster Pancake [Detector], and Model 44-38 Energy Compensated Detector.

(G2)    On or about March 18, 2008, **MALIK** sent an e-mail to **AKHTAR** to which he attached a false end-user statement on PIEAS letterhead claiming that PIEAS would be the end-user of Company G radiation loggers and detectors (itemized therein) that had been ordered on its behalf by CCI-USA. The statement indicated that the products would be "utilized by our field units for natural activity radiation survey." The statement was signed by an individual claiming to be the director of "Safety and Health" in the "Physics Department."

(G3)    On or about March 20, 2008, **MALIK** sent an e-mail to **AKHTAR** to which he attached another false end-user statement on PIEAS letterhead claiming that CCI-USA, an "agent of Newtech Global, Pakistan," was purchasing Company G radiation loggers and detectors on its behalf for use in "natural activity radiation survey[s]." The statement alleged further that because the entity had expanded its facilities, it required additional "Radiation Survey meters" for its radiation surveys, especially in "hospitals where nuclear Medical Equipment is installed." This statement was also signed by an individual claiming to be the director of the "Safety and Health Physics Department."

(G4)    On or about March 24, 2008, **AKHTAR** sent an e-mail to **MALIK** asking him to complete the specific end-user statement forms required by Company G for purchase of the requested radiation loggers and detectors.

(G5)    On or about March 26, 2008, **MALIK** sent an e-mail to **AKHTAR** to which he attached the completed Company G end-user statement form signed by an individual falsely representing himself to be the senior engineer in "Procurement-1" at PIEAS. The name on the certificate was identical to that of a CNPP representative who had an ongoing relationship with **MALIK** and NewTech procuring commodities for the CNPP. The statement alleged that PIEAS

would be the ultimate consignee of the requested radiation loggers and detectors being purchased on its behalf by NewTech. It also alleged that the "equipment Data Logger" would be used at a "Teaching Institute having Health Services facilities" by "field teams for Natural Radiation Surveys and Surveys of Nuclear Medical Facilities."

(G6)   On or about March 26, 2008, **MALIK** sent an e-mail to **AKHTAR** to which he attached an alternate false end-user statement on PIEAS letterhead reflecting the same information contained in the previously sent Company G end-user statement, including the signature of the same individual falsely representing himself to be affiliated with PIEAS, but whose name was identical to that of a CNPP representative.

(G7)   On or about September 8, 2008, **AKHTAR** sent an e-mail to a Company G representative to which he attached a CCI purchase order reflecting purchase by CC-USA of two each of the Model 2350-1 Data Logger (and carrying case), Model 44-10 Gamma Scintillation Detector, Model 44-94 Diamond Cluster Pancake [Detector], and Model 44-38 Energy Compensated Detector.

(G8)   On or about October 22, 2008, **AKHTAR** caused the shipment by Company G of the requested radiation loggers and detectors, invoiced at a total price of $9,880.13, to CC-USA in Columbia, Maryland.

(G9)   On or about October 29, 2008, **AKHTAR** sent an e-mail to a freight forwarder in Virginia advising that he had a package ready for shipment to Dubai. Attached to the e-mail was a false CCI invoice alleging the sale by CC-USA of 2 "Universal Data Logger," valued at a total cost of $300.00, to **MALIK**'s business associate in Dubai.

(G10)   On or about October 31, 2008, **AKHTAR** caused the export of various

Company G radiation loggers and detectors, specifically Model 2350-1 Data Logger (and carrying case), Model 44-10 Gamma Scintillation Detector, Model 44-94 Diamond Cluster Pancake Detector, and Model 44-38 Energy Compensated Detector, from the United States to the CNPP without having obtained the requisite authorization from the Department of Commerce.

18 U.S.C. § 371
50 U.S.C. § 1705(a)

## COUNT TWO

1.      The allegations set forth in paragraphs 1 through 10 of Count One of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2.      Between on or about October 6, 2005, through on or about November 15, 2006, in the State and District of Maryland,

**NAEEM MALIK**
**and**
**NADEEM AKHTAR**

defendants herein, did knowingly and willfully export and cause to be exported certain goods and technologies, to wit, 300 Model DMC-2000S dosimeters distributed by Company A1 and manufactured by Company A2, from the United States to Pakistan without having first obtained the required licenses or authorizations from the Department of Commerce.

50 U.S.C. § 1705(a)
15 C.F.R. § 764.2
18 U.S.C. § 2

## COUNT THREE

1.     The allegations set forth in paragraphs 1 through 9 and 11 of Count One of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2.     Between on or about December 2, 2005, through on or about November 16, 2007, in the State and District of Maryland,

**NAEEM MALIK**
and
**NADEEM AKHTAR**

defendants herein, did knowingly and willfully export and cause to be exported certain goods and technologies, to wit, 75 cubic feet of NRW100 and 50 cubic feet of NRW400 nuclear-grade resins manufactured by Company B, from the United States to Pakistan without having first obtained the required licenses or authorizations from the Department of Commerce.

50 U.S.C. § 1705(a)
15 C.F.R. § 764.2
18 U.S.C. § 2

## COUNT FOUR

1.      The allegations set forth in paragraphs 1 through 9 and 12 of Count One of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2.      Between on or about October 27, 2006, through on or about October 15, 2007, in the State and District of Maryland,

### NAEEM MALIK
### and
### NADEEM AKHTAR

defendants herein, did knowingly and willfully export and cause to be exported certain goods and technologies, to wit, a quantity of Model 90 Fixed Coaxial Attenuators manufactured by Company C, from the United States to Pakistan without having first obtained the required licenses or authorizations from the Department of Commerce.

50 U.S.C. § 1705(a)
15 C.F.R. § 764.2
18 U.S.C. § 2

## COUNT FIVE

1.    The allegations set forth in paragraphs 1 through 9 and 13 of Count One of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2.    Between on or about November 4, 2006, through on or about February 21, 2008, in the State and District of Maryland,

**NAEEM MALIK**
**and**
**NADEEM AKHTAR**

defendants herein, did knowingly and willfully export and cause to be exported certain goods and technologies, to wit, a quantity of Series 20M Selector Switches distributed by Company D, from the United States to Pakistan without having first obtained the required licenses or authorizations from the Department of Commerce.

50 U.S.C. § 1705(a)
15 C.F.R. § 764.2
18 U.S.C. § 2

## COUNT SIX

1.     The allegations set forth in paragraphs 1 through 9 and 14 of Count One of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2.     Between on or about March 3, 2007, through on or about May 29, 2008, in the State and District of Maryland,

### NAEEM MALIK
### and
### NADEEM AKHTAR

defendants herein, did knowingly and willfully export and cause to be exported certain goods and technologies, to wit,  2 MPC 9300 manual alpha/beta counting systems manufactured by Company E, from the United States to Pakistan without having first obtained the required licenses or authorizations from the Department of Commerce.

50 U.S.C. § 1705(a)
15 C.F.R. § 764.2
18 U.S.C. § 2

## COUNT SEVEN

1.      The allegations set forth in paragraphs 1 through 9 and 15 of Count One of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2.      Between on or about September 17, 2007, through on or about May 1, 2008, in the State and District of Maryland,

**NAEEM MALIK**
**and**
**NADEEM AKHTAR**

defendants herein, did knowingly and willfully export and cause to be exported certain goods and technologies, to wit, 3 boxes of 3M abrasive sheets distributed by Company F, from the United States to Pakistan without having first obtained the required licenses or authorizations from the Department of Commerce.

50 U.S.C. § 1705(a)
15 C.F.R. § 764.2
18 U.S.C. § 2

## COUNT EIGHT

1.      The allegations set forth in paragraphs 1 through 9 and 16 of Count One of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2.      Between on or about February 11, 2008, through on or about October 31, 2008, in the State and District of Maryland,

**NAEEM MALIK**
**and**
**NADEEM AKHTAR**

defendants herein, did knowingly and willfully export and cause to be exported certain goods and technologies, to wit, a quantity of radiation loggers and detectors manufactured by Company G, specifically, Model 2350-1 Data Logger, Model 44-10 Gamma Scintillation Detector, Model 44-94 Diamond Cluster Pancake Detector, and Model 44-38 Energy Compensated Detector, from the United States to Pakistan without having first obtained the required licenses or authorizations from the Department of Commerce.

50 U.S.C. § 1705(a)
15 C.F.R. § 764.2
18 U.S.C. § 2

36

## COUNT NINE

1.      The allegations set forth in paragraphs 1 through16 and 18 through 20 of Count One of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2.      Beginning in or about October 2005, and continuing through on or about the date of the return of this Indictment, in the State and District of Maryland and elsewhere,

### NAEEM MALIK
### and
### NADEEM AKHTAR,

defendants herein, did knowingly and intentionally combine, conspire, confederate, and agree with each other, and with persons known and unknown to the Grand Jury, to knowingly and willfully transport, transmit and transfer, and attempt to transport, transmit and transfer, a monetary instrument and funds to a place in the United States from and through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity as charged in Counts One through Eight of this Indictment, specifically, exporting and causing the export of certain goods and technologies from the United States to Pakistan without having first obtained the required licensees or authorizations from the Department of Commerce, and conspiracy to do the same, in violation of Title 50, United States Code, Section 1705, Title 15, Code of Federal Regulations, Section 764.2, and Title 18, United States Code, Section 371.

18 U.S.C. § 1956(h)
18 U.S.C. § 1956(a)(2)(A)

### FORFEITURE NOTICE

1.     The allegations set forth in Counts One through Nine of this Indictment are realleged and incorporated by reference as though fully set forth herein for the purpose of alleging forfeitures of property to the United States of America of property pursuant to the provisions of: Title 18, United States Code, Section 981(a)(1)(C) and 982(a)(1); Title 19, United States Code, Section 1595a(d); and Title 28, United States Code, Section 2461(c).

2.     Upon conviction of the offenses alleged in Counts One through Eight of this Indictment, the defendants shall forfeit to the United States all property, real and personal, constituting proceeds obtained from, or traceable to, the aforestated offenses, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

3.     Upon conviction of the offenses alleged in Counts One through Eight of this Indictment, the defendants shall forfeit to the United States all merchandise exported or sent, or attempted to be exported or sent, from the United States contrary to law, or the proceeds or value thereof, and all property used to facilitate the exporting or sending of such merchandise, the attempted exporting or sending of such merchandise, or the receipt, purchase, transportation, concealment, or sale of such merchandise, pursuant to Title 19, United States Code, Section 1595a(d), and Title 28, United States Code, Section 2461(c).

4.     Upon conviction of the offense alleged in Count Nine of this Indictment, the defendants shall forfeit to the United States all property, real and personal, involved in a transaction or attempted transaction in violation of said offense, or any property traceable to such property, pursuant to Title 18, United States Code, Section 982(a)(1).

5.     Because the property described above as being subject to forfeiture, as a result of acts

38

or omissions of the defendants:

    a.      cannot be located upon the exercise of due diligence;

    b.      has been transferred or sold to, or deposited with, a third party;

    c.      has been placed beyond the jurisdiction of the Court;

    d.      has been substantially diminished in value; or

    e.      has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of monies contained in Bank of America Business Account 003921744455 in the name of Computer Communication USA (Pvt ) Ltd., and any other property of the defendants up to the value of the above-described forfeitable property.

18 U.S.C. § 981(a)(1)(C)
19 U.S.C. § 1595a(d)
18 U.S.C. § 982(a)(1)
28 U.S.C. § 2461(c)

_Rod J. Rosenstein_
Rod J. Rosenstein
United States Attorney

**SIGNATURE REDACTED**

Foreperson

3/11/2010
Date

39